UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRIAN TUITT,

                Petitioner,

      - *against* -

SUPERINTENDENT MARTUSCELLO,

              Respondent.

12 Civ. 1003 (CS)(PED)

**REPORT AND
RECOMMENDATION**

TO:   THE HONORABLE CATHY SEIBEL,
       UNITED STATES DISTRICT JUDGE

## I.  INTRODUCTION

Brian Tuitt ("Petitioner"), proceeding *pro se*, seeks a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 from his March 30, 2006 Westchester County conviction of rape in the first degree and sexual abuse in the first degree (Molea, J.).  This matter comes before me pursuant to an Order of Reference dated June 22, 2012.  (Dkt. 17.)  For the reasons set forth below, I respectfully recommend that the petition be **DISMISSED** as untimely.

## II.  BACKGROUND

### A.    The Crimes, Indictment, Guilty Plea, and Sentencing[1]

On the morning of February 3, 2005, Petitioner, an eighteen-year veteran of the New York City Police Department, arrived in uniform at the Royal Regency hotel, located on Tuckahoe Road in Yonkers, New York.  Petitioner's family friend and her two daughters (ages 11 and 13) and niece (age 11) had been staying at the hotel and were returning to their home in Pennsylvania that day.  Petitioner entered the hotel room where the eleven-year-old niece was

---

[1] The information in this section is taken from a review of Respondent's Limited Answer ("Resp't's Answer") (Dkt. 14) and other materials filed by Petitioner.

watching television alone and raped her.  Petitioner then directed the niece to bring the other girls

into the hotel room.  When the girls entered the room, Petitioner sexually abused them both by

putting his hands in their underwear and touching their genitals.  Police estimated the assaults

occurred sometime between 7:30 and 8:30 a.m.  Later that same day, Petitioner was arrested in

the Bronx on unrelated child sex abuse charges.[2]

On February 8, 2005, after learning of the Bronx charges, the Pennsylvania

mother/guardian questioned her daughters and niece about their contacts with Petitioner.  The

girls then described the hotel room abuse.  Petitioner was arrested on February 16, 2005 in

connection with the hotel room episode.  He was indicted on August 18, 2005 on the following

offenses: rape in the first degree (one count);[3] rape in the second degree (one count);[4] sexual

---

[2]The Bronx victims were sisters aged six and eleven.  In that case, Petitioner ultimately pled guilty  to course of sexual conduct against a child in the first degree, in violation of N.Y. Penal Law § 130.75, and received a sentence of ten years imprisonment, to run concurrent with the Westchester County sentence.

[3]
A person is guilty of rape in the first degree when he or she engages in sexual intercourse with another person: (1) By forcible compulsion; or . . . (3) Who is less than eleven years old; or (4) Who is less than thirteen years old and the actor is eighteen years old or more.

N.Y. Penal Law § 130.35.

[4] "A person is guilty of rape in the second degree when . . . being eighteen years old or more, he or she engages in sexual intercourse with another person less than fifteen years old . . . ." N.Y. Penal Law § 130.30(1).

abuse in the first degree (four counts);[5] sexual abuse in the second degree (two counts);[6] and

endangering the welfare of a child (three counts).[7]

Petitioner accepted a plea bargain and, on February 2, 2006, pled guilty to one count of

rape in the first degree and two counts of sexual abuse in the first degree in full satisfaction of the

indictment.  Petitioner was sentenced on March 30, 2006, in accordance with the negotiated plea,

to concurrent terms of five years imprisonment (and five years post-release supervision) for the

rape conviction and two years imprisonment for each of the sexual abuse convictions.

Petitioner was advised at his sentencing what procedural requirements were needed in

order to perfect an appeal.  Specifically, the court stated:

> You have the right to appeal the sentence just imposed on you.  If you decide
> to appeal, you must do so within 30 days by filing a Notice of Appeal with the
> Appellate Division Second Department.
> You have a period of 90 days within which to perfect that appeal, unless that
> time is extended by the Appellate Division.
> If you do not have an attorney to represent you in connection with such an
> appeal, the Appellate Division will assign you one free of charge if you make an
> application for such an assignment.
> In order to protect your interests, your present attorney will remain as your
> attorney for the sole purpose of filing such a Notice of Appeal.

---

[5] "A person is guilty of sexual abuse in the first degree when he or she subjects another
person to sexual contact: (1) By forcible compulsion; or . . . (3) When the other person is less
than eleven years old."  N.Y. Penal Law § 130.65 (amended by 2011 N.Y. Sess. Law ch. 26, § 1
(2011)).

[6] "A person is guilty of sexual abuse in the second degree when he or she subjects
another person to sexual contact and when such other person is . . . [l]ess than fourteen years
old."  N.Y. Penal Law § 130.60(2).

[7] "A person is guilty of endangering the welfare of a child when . . . [h]e knowingly acts
in a manner likely to be injurious to the physical, mental or moral welfare of a child less than
seventeen years old . . . ."  N.Y. Penal Law § 260.10 (amended by 2010 N.Y. Sess. Law ch. 447,
§ 2 (2010)).

(Mar. 30, 2006 Tr., at 12 (attached to Resp't's Mem. of Law (Dkt. 15), at Ex. B).[8])

**B.**     **Direct Appeal**

Petitioner did not file a timely appeal.  More than a year after he was sentenced, however,

in an application dated May 7, 2007, Petitioner, proceeding *pro se*, sought leave from the

Appellate Division, Second Department, to file a late notice of appeal.  (See Resp't's Mem. of

Law, at Ex. C.)  In that application, he stated:

> I am writing regarding my appeal in which I was under the impression that
> my attorney on record was suppose [*sic*] to file as per order of the judge.  However,
> after waiting for a year, my attorney has refused to confirm to me that he has even
> filed a Notice of Appeal.  This attorney was suppose [*sic*] to protect my interest as
> per judges orders and statute.  He has failed to do that and hand over any and all
> paperwork to me regarding my case.

(Id. at 1 (unpaginated).)[9]

The Second Department denied Petitioner's request on July 6, 2007.[10]  (Ex. E.)  On

_____

[8] Unless otherwise specifically indicated, exhibits cited herein are attached to
Respondent's Memorandum of Law (Dkt. 15).

[9] The record contains a copy of a letter dated June 6, 2006, in which Petitioner's attorney
advised Petitioner that he was only ordered by the court to remain as Petitioner's retained counsel
for the 30-day period in which Petitioner could have filed a notice of appeal.  According to
counsel's letter, Petitioner "chose not to do so."  (Ex. D, at 1.)

[10] Specifically, Petitioner's request to file a late notice of appeal was denied pursuant to
N.Y. Crim. Proc. Law § 460.30(1), which provides:

> Upon motion to an intermediate appellate court of a defendant who desires to take
> an appeal to such court from a judgment, sentence or order of a criminal court but
> has failed to file a notice of appeal, . . . within the prescribed period, such
> intermediate appellate court . . . may order that the time for the taking of such appeal
> . . . be extended to a date not more than thirty days subsequent to the determination
> of such motion, upon the ground that the failure to so file . . . in timely fashion
> resulted from (a) improper conduct of a public servant or improper conduct, death
> or disability of the defendant's attorney, or (b) inability of the defendant and his
> attorney to have communicated, in person or by mail, concerning whether an appeal

August 30, 2007, the New York Court of Appeals dismissed Petitioner's application for a

certificate to appeal.  (Ex. F.)  On November 7, 2007, the New York Court of Appeals denied

Petitioner's application for reconsideration.  (Ex. G.)

**C.**     **First Motion to Vacate Judgment of Conviction**

More than a year and a half later, on July 20, 2009, Petitioner moved to vacate the

judgment of conviction pursuant to N.Y. Crim. Proc. Law § 440.10.[11] In that motion, Petitioner

claimed that his right to effective assistance of counsel was denied due to his attorney's failure to

file a notice of appeal or to conduct an investigation.  (Ex. H.)  Respondent represents that the

motion was denied by the trial court on November 18, 2009 and that leave to appeal this decision

was denied by the Second Department on June 24, 2010.  (See Resp't's Answer, at 7.)

**D.**     **Second Motion to Vacate Judgment of Conviction**

In an application dated September 7, 2010, Petitioner again sought to vacate his

conviction.  He raised the same ineffective assistance of counsel claims he had raised in his first

§ 440.10 motion.  In addition, he claimed that the prosecution withheld exculpatory evidence.

(Ex. I.)  Respondent represents that the motion was denied by the trial court on March 7, 2011

and that leave to appeal this decision was denied by the Second Department on September 15,

---

should be taken, prior to the expiration of the time within which to take an appeal
due to defendant's incarceration in an institution and through no lack of due
diligence or fault of the attorney or defendant.  Such motion must be made with due
diligence after the time for the taking of such appeal has expired, and in any case not
more than one year thereafter.

N.Y. Crim. Proc. Law § 460.30(1).

[11] "At any time after the entry of a judgment, the court in which it was entered may, upon
motion of the defendant, vacate such judgment . . . ."  N.Y. Crim. Proc. Law § 440.10(1).

2011.  (See Resp't's Answer, at 8.)  By application dated June 9, 2011, Petitioner also moved the

trial court for reconsideration of its March 7, 2011 order denying the motion.  (Ex. J.)

Respondent represents that on June 21, 2011, the trial court granted Petitioner's motion to

reargue but adhered to its prior decision denying the motion to vacate the conviction.

Respondent also represents that the Second Department denied leave to appeal this decision on

March 26, 2012 and that the New York Court of Appeals denied Petitioner's application for a

certificate of appeal on May 14, 2012.  (See Resp't's Answer, at 9.)

**E.**     **Petition for Writ of *Error Coram Nobis***

By petition dated March 15, 2012, Petitioner sought a writ of *error coram nobis*.  (Ex. K.)

The Second Department denied the petition on August 8, 2012, specifically stating:

> Application by the defendant for a writ of error coram nobis seeking leave to
> file a late notice of appeal from a judgment of the County Court, Westchester County,
> rendered March 30, 2006.
> ORDERED that the application is denied.
> The defendant has not established his entitlement to the relief requested (see
> People v. Syville, 15 N.Y.3d 391 . . . [2010]).

People v. Tuitt, 949 N.Y.S.2d 633, 633-34 (App. Div. 2012).  Leave to appeal was denied by the

New York Court of Appeals in a Table Decision dated October 25, 2012.  People v. Tuitt, 19

N.Y.3d 1105 (2012) (Table).

**F.**     **Third Motion to Vacate Judgment of Conviction**

Respondent represents that Petitioner filed a third motion in the trial court seeking to

vacate the judgment of his conviction "on the ground that the trial court failed to certify his

Sentence and Commitment Order to reflect his status as a sex offender."  (Resp't's Suppl. Mem.

of Law, at 2 (Dkt. 38).)  Respondent states that the motion was denied on August 28, 2012 but

that the court ordered that the Sentence Order be amended to reflect Petitioner's sex offender status. (See id.)  Respondent also represents that the Second Department denied leave to appeal on December 27, 2012.  (See id.)

Respondent represents that Petitioner moved to reargue this motion.  (See id.)  It states that the trial court granted the motion to reargue, but thereafter denied the motion to vacate on October 24, 2012.  (See id.)  It represents that leave to appeal was denied by the Second Department on March 27, 2013.  (See id. at 2-3.)

**G.**   **Article 78 Petition**

Respondent represents that Petitioner filed a petition pursuant to Article 78 of the New York State Civil Rules of Procedure seeking a declaratory judgment against the trial court judge and challenging his amended Sentencing Order.  (See id. at 3.)  Respondent states that the Second Department dismissed the petition on February 27, 2013.  (See id.)

**H.**   **Federal *Habeas Corpus* Proceedings**

By petition dated January 4, 2012, Petitioner seeks a federal writ of *habeas corpus*.  He raises the following twenty-nine claims:

    (1)    Petitioner "was denied due process of law under the Fourteenth Amendment to the United States Constitution when the prosecutor failed to release discovery when requested," (Pet., at 4 (unpaginated) (Dkt. 2));

    (2)    Petitioner "was denied due process of law under the Fourteenth Amendment to the United States Constitution when the prosecutor failed to turn over Brady material," (id. at 5);

    (3)    Petitioner "was denied his right to effective assistance of counsel under the Sixth Amendment to the United States Constitution when counsel misrepresented the facts to [Petitioner] by lying to [him]," (id. at 6);

    (4)    Petitioner "was denied effective assistance of counsel under the Sixth Amendment to the United States Constitution when his counsel failed to investigate the discovery material," (id. at 7);

    (5)    Petitioner "was denied his right to effective assistance of counsel under the

Sixth Amendment to the United States Constitution when counsel failed to challenge the medical evidence," (id. at 8);

(6)     Petitioner "was denied his right to effective assistance of counsel under the Sixth Amendment to the United States Constitution when defense counsel failed to investigate the affidavit from the alleged victim regarding the phone call," (id. at 10);

(7)     Petitioner "was denied his right to effective assistance of counsel under the Sixth Amendment to the United States Constitution when defense counsel failed to investigate the mental health record of one of the alleged victims," (id. at 11);

(8)     Petitioner "was denied his right to effective assistance of counsel under the Sixth Amendment to the United States Constitution when defense counsel failed to locate and interview witnesses," (id. at 12-13);

(9)     Petitioner "was denied his right to effective assistance of counsel under the Sixth Amendment to the United States Constitution when counsel failed to investigate and retrieve phone records," (id. at 15);

(10)   Petitioner "was denied his right to effective assistance of counsel under the Sixth Amendment to the United States Constitution when his defense counsel failed to retrieve and investigate a police audio recording," (id. at 16);

(11)   Petitioner "was denied his right to effective assistance of counsel under Sixth Amendment to the United States Constitution when defense counsel failed to retrieve stored digital recordings, alert the police about the recordings after listening to the recordings on [Petitioner]'s cell phone," (id. at 17);

(12)   Petitioner "was denied his right to effective assistance of counsel under the Sixth Amendment to the Untied [sic] States Constitution when defense counsel failed to visit the alleged crime location, conduct any investigation and verify if surveillance equipment existed," (id. at 18);

(13)   Petitioner  "was denied effective assistance of counsel under the Sixth Amendment to the United States Constitution when his counsel failed to investigate the criminal and family history of the guardian and alleged victims," (id. at 19);

(14)   Petitioner "was denied effective assistance of counsel under the Sixth Amendment to the United States Constitution when his counsel became an advocate for the prosecution and when his counsel failed to follow his clients' [sic] instructions," (id. at 21);

(15)   Petitioner "was denied effective assistance of counsel under the Sixth Amendment to the United States Constitution when his counsel failed to do a direct appeal as order [sic] to do so by the court," (id. at 23);

(16)   Petitioner "was denied proper access to court in violation of the First Amendment when Prosecution refused to respond to [Petitioner]'s first 440.10 post-conviction motion," (id.);

(17)   Petitioner "was denied his right to effective assistance of counsel under the Sixth Amendment to the United States Constitution when counsel failed to

8

place on record the pre investigation report," (id. at 24);

(18)   Petitioner "was denied die [*sic*] process of law under the Fourteenth Amendment to the United States Constitution when the prosecutor withheld a Rape Kit," (id. at 25);

(19)   Petitioner "was denied effective assistance of counsel under the Sixth Amendment to the United States Constitution when counsel failed to inform him that he needed to be certified as a sex offender according to operation law," (id. at 26);

(20)   Petitioner "was denied effective assistance of counsel under the Sixth Amendment to the United States Constitution when his counsel failed to notice that the alleged victim 'TG' took a shower and the police allowed it," (id.);

(21)   Petitioner "was denied due process when Prosecution committed Misconduct when they allowed the alleged victim to take a bath," (id. at 27);

(22)   Petitioner "was denied effective assistance of counsel under the Sixth Amendment to the United States Constitution when counsel advised [Petitioner] to plead guilty," (id. at 28);

(23)   Petitioner "was denied effective assistance of counsel under the Sixth Amendment to the United States Constitution when counsel failed to advise him that he would need to be certified during the plea of guilt [*sic*] by the court," (id. at 29);

(24)   Petitioner "was denied due process of law and a plea not knowing or voluntary when the court allowed him to plea [*sic*] guilty without informing him of direct consequences," (id.);

(25)   Petitioner "was denied effective assistance of counsel under the Sixth Amendment to the United States Constitution when his counsel failed to prove actual innocence," (id. at 30);

(26)   Petitioner "was denied effective assistance of counsel under the Sixth Amendment to the United States Constitution when counsel failed to investigate an alibi," (id.);

(27)   Petitioner "was denied effective assistance of counsel under the Sixth Amendment to the United States Constitution when his counsel failed to retrieve an inflammatory news report," (id. at 32);

(28)   Petitioner "was denied the right to effective assistance of counsel under the Sixth Amendment to the United States Constitution when his counsel failed do [*sic*] any meaningful adversarial proceeding," (id. at 36); and

(29)   Petitioner "was denied access to the Court when the court placed on the record that they do not know if discovery or any material was ever given to [Petitioner]'s counsel and the court could not prove if the police audio tape was authenticated, in violation under the First, Sixth and Fourteenth Amendment," (id. at 37).

Respondent argues, *inter alia*, that the petition should be dismissed as time-barred.

9

(See Resp't's Mem. of Law, at 12-19.[12])  Petitioner contends that the statute of limitations should

be equitably tolled (1) due to his attorney's failure to file a notice of appeal and (2) because of

Petitioner's mental health disability.  Petitioner also argues (3) that his failure to timely file

should be excused because he is actually innocent.  (See, e.g., Pet., at 34; see also Pet'r's Answer

to Opp'n (Dkt. 18); Pet'r's Mot. to Answer Opp'n (Dkt. 19); Pet'r's Mem. of Law (Dkt. 20);

Pet'r's 2d Suppl. (Dkt. 24); Pet'r's Resp. to Opp'n (Dkt. 50).[13])

## III.  DISCUSSION

### A.    Applicable Law on *Habeas Corpus* Review

"Habeas review is an extraordinary remedy."  Bousley v. United States, 523 U.S. 614,

621 (1998) (citing Reed v. Farley, 512 U.S. 339, 354 (1994)).  Before a federal district court may

review the merits of a state criminal judgment in a *habeas corpus* action, the court must first

determine whether the petitioner has complied with the procedural requirements set forth in by

the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132,

110 Stat. 1220 (Apr. 24, 1996).

Under AEDPA, a federal *habeas corpus* petition is subject to a strict, one-year statute of

limitations.  See 28 U.S.C. § 2244(d).  The statute provides four different potential starting

points for the limitations period, and specifies that the latest of these shall apply.  See id. §

---

[12]The memorandum begins at page 12.

[13] Petitioner has submitted a multitude of letters, "answers," motions, memorandums, "responses," and other documents to this Court, and has done so without first seeking and being granted leave.  Nonetheless, this Court construes Petitioner's submissions liberally and interprets them to raise the strongest arguments suggested.  See Haines v. Kerner, 404 U.S. 519, 520-21 (1972) (per curiam) (*pro se* allegations contained in *habeas corpus* petitions should be liberally construed); Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)) (application submitted by *pro se* petitioner should be "read liberally and should be interpreted 'to raise the strongest arguments that [it] suggest[s]'").

2244(d)(1).  Under the statute, the limitation period is tolled only during the pendency of a

properly filed application for state post-conviction relief, or other collateral review, with respect

to the judgment to be challenged by the petition.  See id. § 2244(d)(2).  The statute reads as

follows:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas
> corpus by a person in custody pursuant to the judgment of a State court.  The
> limitation period shall run from the latest of–
>> (A) the date on which the judgment became final by the conclusion of direct
>> review or the expiration of the time for seeking such review;
>> (B) the date on which the impediment to filing an application created by
>> State action in violation of the Constitution or laws of the United States is
>> removed, if the applicant was prevented from filing by such State action;
>> (C) the date on which the constitutional right asserted was initially
>> recognized by the Supreme Court, if the right has been newly recognized by
>> the Supreme Court and made retroactively applicable to cases on collateral
>> review; or
>> (D) the date on which the factual predicate of the claim or claims presented
>> could have been discovered through the exercise of due diligence.
> (d)(2) The time during which a properly filed application for State post-conviction
> or other collateral review with respect to the pertinent judgment or claim is pending
> shall not be counted toward any period of limitation under this subsection.

Id. § 2244(d).

However, AEDPA's one-year limitation period is subject to equitable tolling.  See Rivas

v. Fischer, 687 F.3d 514, 537 (quoting Holland v. Florida, 130 S. Ct. 2549, 2560 (2010))

("AEDPA's statute of limitations is not jurisdictional and 'does not set forth an inflexible rule

requiring dismissal whenever its clock has run'").  "Rather, the limitations period in § 2241(d)

'is subject to equitable tolling in appropriate cases'–specifically, where the petitioner shows '(1)

that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance

stood in his way and prevented timely filing.'"  Id. at 538 (quoting Holland, 130 S. Ct. at 2560,

2562).  "Whether a circumstance is extraordinary depends not on 'how unusual the circumstance

alleged to warrant tolling is among the universe of prisoners, but rather how severe an obstacle it

11

is for the petitioner endeavoring to comply with AEDPA's limitations period.'" Id. (quoting Diaz v. Kelly, 515 F.3d 149, 154 (2d Cir. 2008)).

The Second Circuit has also recently held that the failure to timely file a *habeas* petition may be excused where the petitioner presents "a credible and compelling claim of actual innocence." Id. at 540. Such a showing requires the petitioner "to create sufficient doubt about his guilt that the habeas court will permit him to pursue his accompanying constitutional claims notwithstanding an otherwise applicable procedural bar." Id. at 541. "'[T]he evidence must establish sufficient doubt about [the petitioner's] guilt to justify the conclusion that his [custody] would be a miscarriage of justice unless his conviction was the product of a fair trial.'" Id. (quoting Schlup v. Delo, 513 U.S. 298, 316 (1995)) (emphasis omitted). "Accordingly, to present a successful gateway claim of actual innocence a petitioner must present 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" Id. (quoting Schlup, 513 U.S. at 316).

The evidence of actual innocence "must be both 'credible' and 'compelling.'" Id. at 541 (quoting House, 547 U.S. at 521). To be "credible," the evidence must consist of "'new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial.'" Id. (quoting Schlup, 513 U.S. at 324). To determine whether the new evidence is reliable, the *habeas* court must "consider[ ] it both on its own merits and, where appropriate, in light of the pre-existing evidence in the record." Doe v. Menefee, 391 F.3d 147, 161 (2d Cir. 2004). To be "compelling," the evidence must reveal that, "'more likely than not, in light of the new evidence, no reasonable juror would find [the petitioner] guilty beyond a reasonable doubt–or to remove the double negative, that

12

more likely than not any reasonable juror would have reasonable doubt.'" <u>Rivas</u>, 687 F.3d at

541 (quoting <u>House</u>, 547 U.S. at 538).  The *habeas* court must "consider a petitioner's claim in

light of the evidence in the record as a whole, including evidence that might have been

inadmissible at trial." <u>Doe</u>, 391 F.3d at 162.  Specifically,

> [T]he court must consider how reasonable jurors, fairly examining all of the evidence
> presented, would assess the petitioner's guilt or innocence.  In evaluating the record
> as a whole, the habeas court may make its own credibility determinations as to both
> the new evidence and the evidence already in the record that may be thrown into
> doubt by the new material.  With respect to the ultimate issue of innocence, however,
> <u>Schlup</u> does not permit the court to make an independent judgment of whether
> reasonable doubt exists, but instead requires a probabilistic determination about what
> reasonable, properly instructed jurors would do.  This probabilistic analysis must
> determine not merely whether a reasonable doubt exists in the light of the new
> evidence, but rather whether it is more likely than not that no reasonable juror would
> have found the defendant guilty.

<u>Id.</u> at 163 (internal quotation marks and citations omitted); <u>see also</u> <u>Rivas</u>, 687 F.3d at 547

(quoting <u>House</u>, 547 U.S. at 554) (the evidence must be such that, had the jury heard all the

evidence at trial, "'it is more likely than not that no reasonable juror viewing the record as a

whole would lack reasonable doubt'").  This standard requires the petitioner who raises a

gateway actual innocence claim "'to make a stronger showing than that needed to establish

prejudice.'" <u>Rivas</u>, 687 F.3d at 541 (quoting <u>Schlup</u>, 513 U.S. at 327).  "'At the same time, the

showing of more likely than not imposes a lower burden of proof than the clear and convincing

standard required under <u>Sawyer v. Whitley</u>, 505 U.S. 333, 336 (1992), which applies to claims of

actual innocence of the death penalty.'" <u>Id.</u> (quoting <u>Schlup</u>, 513 U.S. at 327).  Nevertheless, the

"more likely than not" "standard is 'demanding and permits review only in the extraordinary

case.'" <u>Id.</u> at 542 (quoting <u>House</u>, 547 U.S. at 538).

**B.**    **<u>Analysis of Petitioner's Application</u>**

13

Petitioner acknowledges that his federal *habeas* petition was not timely filed.[14]  (See, e.g., Req. for an Evidentiary Hr'g, at 3.)  Accordingly, this Court may not review the merits of Petitioner's claims unless he can show that he is entitled to equitable tolling or presents a credible and compelling gateway claim of actual innocence.

### 1.   *Equitable Tolling*

Petitioner's submissions may be liberally construed to argue that his *habeas* petition should be equitably tolled due to: (1) his mental health impairments, and (2) his counsel's failure to timely perfect his appeal or obtain discovery.  Respondent contends that Petitioner's arguments do not warrant equitable tolling.  (See generally Resp't's Mem. of Law.)

### i.   **Mental Health**

"Mental illness can serve as a potential ground for equitable tolling." Artis v. Huliahn,

---

[14] The petition was filed more than four years after the AEDPA limitations period expired on May 1, 2007.  See 28 U.S.C. § 2254(d)(1)(A).  Because Petitioner did not file a notice of appeal, his conviction became final thirty days after he was sentenced, on May 1, 2006.  See N.Y. Crim. Proc. Law § 460.10(1)(a) ("A party seeking to appeal from a judgment or a sentence or an order and sentence included within such judgment . . . must, within thirty days after imposition of the sentence . . . file with the clerk of the criminal court in which such sentence was imposed or in which such order was entered a written notice of appeal . . . stating that such party appeals therefrom to a designated appellate court."); Bethea v. Girdich, 293 F.3d 577, 578 (2d Cir. 2002) (per curiam) (AEDPA's one-year limitations period begins to run when a petitioner's time to file a notice of appeal expires under N.Y. Crim. Proc. Law § 460.10); id. at 578-79 (application for leave to file a late notice of appeal does not toll or reset AEDPA's one-year limitations period or this statutory starting point).  Petitioner's submissions do not suggest any basis for applying any of the alternative starting points under § 2254(d)(1).

Petitioner's subsequently filed state court motions and petitions do not reset the starting date of the limitations period because each was filed after the May 1, 2007 deadline.  See, e.g., De Los Santos v. Ercole, No. 07 Civ. 7569(KMK)(PED), 2013 WL 1189474, at *3 (S.D.N.Y. Mar. 22, 2013) (emphasis in original) (collecting cases and holding that a collateral motion that was not filed "*within* the one-year limitation period" does not reset or toll the statute).

Copies of unreported cases cited herein will be mailed to Petitioner.  Lebron v. Sanders, 557 F.3d 76 (2d Cir. 2009).

14

No. 09 Civ. 9893(BSJ)(JCF), 2010 WL 4668926, at *4 (S.D.N.Y. Nov. 12, 2010) (citing

Bolarinwa v. Williams, 593 F.3d 226, 231 (2d Cir. 2010)).  The petitioner bears the burden of

showing "a 'particularized description of how [his] condition adversely affected [his] capacity to

function generally or in relationship to the pursuit of [his] rights.'"  Id. (quoting Boos v. Runyon,

201 F.3d 178, 185 (2d Cir. 2000)).  Accordingly, the petitioner "must demonstrate that his

'particular disability constituted an extraordinary circumstance severely impairing [his] ability to

comply with the filing deadline, despite [his] diligent efforts to do so.'"  Id. (quoting Bolarinwa,

593 F.3d at 232).  This requires showing "sufficient detail about his mental illness to justify

equitable tolling."  Id. at *5.  A petitioner may not rely on "simple assertion[s]," but rather must

"demonstrate[ ] that he was 'so incapable of rational thought that he could not appreciate his

situation, or lacked the wherewithal to ascertain that he must take legal steps.'"  Id. (quoting

Alaouie v. Ercole, No. 08 Civ. 3277(BSJ)(AJP), 2009 WL 2001741, at *3 (July 9, 2009)).

　　　Here, Petitioner contends that he suffered from post-traumatic stress disorder ("PTSD")

as a result of participating as a first responder on September 11, 2001.  Specifically, he states

that "[i]t is well recognized that first responders, who participated during 9/11 are developing

illnesses related to their participation in the search, rescue, recovery or clean-up."  (Pet'r's

Answer to Opp'n, at 2.)  Petitioner has also attached "medical documents" to his submissions.

(Id. at Ex. 1.)  These documents consist of: (1) a December 26, 2007 letter requesting treatment

for PTSD; (2) medical records from the Westchester County Medical Center diagnosing

Petitioner with depression from February through April 2005; (3) mental health progress notes

and a psychiatric assessment from the New York City Correctional Health Services dated March

27 and March 30, 2010; and (4) a copy of pages taken from the Diagnostic and Statistical

Manual of Mental Disorders ("DSM-IV") describing PTSD.

First, Petitioner's exhibits do not show that he suffered from PTSD during the entire period that AEDPA's one-year limitation period ran (May 1, 2006 through May 1, 2007) or during the entire period of time that he seeks to equitably toll (May 1, 2007 through January 4, 2012).  (See, e.g. id. at Ex. 1 app. (Petitioner recognizing that "PTSD comes and goes").)  This undermines any claim that Petitioner's condition prevented him from complying with the *habeas* filing deadline, despite a diligent effort to do so.

Second, even if the Court assumes, *arguendo*, that Petitioner suffered from PTSD during this entire period, he fails to show that the condition prevented him from appreciating his legal situation and taking appropriate steps to file his petition.  Petitioner simply makes a conclusory assertion that he suffered from PTSD; without more, this fails to meet Petitioner's burden to show entitlement to equitable tolling.  See, e.g., Artis, 2010 WL 4668926, at *4 n.4 (internal quotation marks omitted) ("As with mental health claims, a petitioner seeking equitable tolling based on physical health must provide supporting evidence rather than relying on conclusory allegations and must prove that he was unable to pursue his legal rights during the entire period that he sought to have tolled."); Rhodes v. Senkowski, 82 F. Supp. 2d 160, 173 (S.D.N.Y. 2000) ("[P]hysical or mental illness could toll the AEDPA's one-year time period to file a habeas corpus petition; however, a petitioner must allege more than the mere existence of physical or mental ailments to justify equitable tolling.  A petitioner has the burden to show that these health problems rendered him unable to pursue his legal rights during the . . . time period.").  Moreover, as noted in Section II above, Petitioner acknowledges that he actively pursued legal remedies in the state courts during this time frame.  Petitioner's aggressive efforts to obtain relief in another forum are inconsistent with his contention now that his mental health precluded him from appreciating his legal situation and seeking federal *habeas* relief.  See, e.g., De Los Santos, 2013

16

WL 1189474, at *7 (noting that "courts have regularly held that a petitioner is not entitled to equitable tolling when his conduct indicates that he was able to investigate and pursue other legal avenues during the time period at issue," and collecting cases).

Third, Petitioner fails to show that, despite his condition, he nonetheless made diligent efforts to file a federal *habeas* petition.  Petitioner argues only that he was aware of his *direct appeal* deadline, that he wanted to file a *direct appeal*, and that he repeatedly and diligently contacted his attorney after the sentencing to inquire about the status of his *direct appeal*.  (See, e.g., Pet'r's Answer to Opp'n, at 19-20 (stating that Petitioner repeatedly contacted his attorney about his direct appeal and filed several grievances regarding counsel's failure to file that appeal); Pet'r's Mem. of Law, at 14-15 (same).)  The record contains no indication that Petitioner attempted to comply with his federal *habeas* deadline.

Petitioner has not shown any "extraordinary circumstance" that warrants equitable tolling of AEDPA's statute of limitations.  Accordingly, I recommend that the limitations period not be tolled on this basis.

### ii.      **Ineffective Assistance of Counsel**

Petitioner also seeks equitable tolling based on his attorney's failure to file a notice of appeal.  "Because a lawyer is the agent of his client, the client generally 'must bear the risk of attorney error.'"  Rivas, 687 F.3d at 538 (quoting Holland, 130 S. Ct. at 2563).  "Therefore, 'a garden variety claim of excusable neglect, such as a simple miscalculation that leads a lawyer to miss a filing deadline, does not warrant equitable tolling.'"  Id. (quoting Holland, 130 S. Ct. at 2564).  "Rather, in order to rise to the level necessary to constitute an 'extraordinary circumstance,' for purposes of tolling § 2254's limitation period, attorney negligence must be so egregious as to amount to an effective abandonment of the attorney-client relationship."  Id.

17

Abandonment has been found, for example, where "counsel ignored letters of [his] client emphasizing the importance of filing on time," id. (citing Dillon v. Conway, 642 F.3d 358, 363-64 (2d Cir. 2011) (per curiam)), or where counsel "fail[ed] to timely file [after] assuring the petitioner that [he] would do so," Sanford v. Lee, No. 11 Civ. 5714(JPO)(AJP), 2012 WL 2376953, at *3 (S.D.N.Y. June 22, 2012) (Report & Recommendation), adopted by 2012 WL 3062692 (S.D.N.Y. July 25, 2012) (citing Nickels v. Conway, 480 F. App'x 54, 56 (2d Cir. 2012)).

Here, even if Petitioner's self-serving allegations that his attorney ignored his instructions and/or misled him concerning the filing of a notice of appeal are accepted at face value, it makes no difference because Petitioner has not shown any "causal relationship" between the attorney's conduct and Petitioner's failure to file a timely federal *habeas* petition. Valverde v. Stinson, 224 F.3d 129, 134 (2d Cir. 2000). Petitioner utterly fails to explain why, after he learned that his attorney failed to file a notice of appeal and after the state court denied his *pro se* request to file a late notice, he waited four and a half years to initiate this federal action. See, e.g., Thomas v. Donnelly, No. 10 Civ. 3922(LTS)(AJP), 2010 WL 4628009, at *4 (S.D.N.Y. Nov. 16, 2010) (Report & Recommendation), adopted as modified on other grounds by 2011 WL 4448948 (S.D.N.Y. Sept. 26, 2011)(collecting cases holding that ineffective assistance claims involving failures to file appeal notices did not warrant equitable tolling due to lack of causation).

Thus, Petitioner has not shown any "extraordinary circumstance" that warrants equitable tolling of AEDPA's statute of limitations.  I recommend that the limitations period not be tolled on this basis.

2.     ***Actual Innocence***

18

Petitioner argues that the untimeliness of his *habeas* petition should be excused because he is actually innocent of the underlying offenses.  He has presented certain documents which he claims were withheld by the prosecution, or are otherwise new, credible, and supportive of his actual innocence claim.  The documents include: (1) an affidavit by police officer Patricia Yasinski, summarizing her interview with the victims, (2) a hotel receipt showing the family's check-out time, (3) Petitioner's cell phone records, (4) a New York City Police Department "Command and Movement Log," (4) the victims' medical records, and (5) a police audio tape.[15] (See Pet'r's Answer to Opp'n, at 2-3; Pet'r's Resp. to Opp'n, at Exs. 1-2.)  Respondent disputes Petitioner's contention that he is actually innocent and argues, *inter alia*, that the material Petitioner relies on is not compelling evidence of actual innocence.  (See Resp't's Suppl. Mem. of Law, at 5-10.)  I agree with Respondent.[16]

---

[15] Petitioner also attaches news articles from 2007 regarding former Westchester County District Attorney Jeanine Pirro.  (See Pet'r's Answer to Opp'n, at Ex. 6.)  Petitioner argues that the articles support his actual innocence claim because they indicate that the District Attorney ran for reelection and, therefore, "any evidence that exonerated [Petitioner] would not be turned over [by prosecutors] because it would look bad for her politics if [Petitioner] was innocent of the indictments."  (Pet'r's Mem. of Law, at 10.)  These news items are not evidence of Petitioner's actual innocence, whether considered alone or in conjunction with the other materials Petitioner has presented.

[16] As discussed above, a successful gateway claim of actual innocence "must be both 'credible' and 'compelling.'"  Rivas, 687 F.3d at 541 (quoting House, 547 U.S. at 521).  To be "credible," the evidence must be both "new" and "reliable."  Id. (citing Schlup, 513 U.S. at 324).  However, the definition of "new" evidence remains an open question in this Circuit.  In Schlup, the Supreme Court required only that a claim of actual innocence be supported with "new reliable evidence" that was "not presented at trial."  513 U.S. at 324.  Other Circuits considering this component have split over whether the new evidence must have been "unavailable" at the time of trial, or simply "not produced" at that time.  Compare Gomez v. Jaimet, 350 F.3d 673, 676 (7th Cir. 2003) (new evidence is evidence that was not presented to the fact finder at the time of trial; and Griffin v. Johnson, 350 F.3d 956, 963 (9th Cir. 2003), cert. denied 541 U.S. 998 (2004) (same); with Kidd v. Norman, 651 F.3d 947, 953 (8th Cir. 2011), cert. denied, 133 S. Ct. 137 (2012) (new evidence is "evidence which was not available at trial through the exercise of due diligence"); and Houck v. Stickman, 625 F.3d 88, 93-94 (3d Cir. 2010), cert. denied, 131

      i.      **The Officer's Affidavit, the Hotel Receipt, the Cell Phone Records, and the Command and Movement Log**

Police investigators estimated that the rape and assaults occurred sometime between 7:30 and 8:30 a.m. on February 3, 2005. Much of Petitioner's "actual innocence" claim represents an attack on that reconstructed timeline.

First, Petitioner provides excerpts of his cell phone records from February 2 and 3, 2005. (Pet'r's Answer to Opp'n, at Ex. 3; see also Pet'r's Resp. to Opp'n, at Ex. 1.) He contends that these records show that his phone received incoming calls on February 3, 2005 at 5:59, 6:20, 8:27, and 11:22 a.m.[17] He also provides an affidavit–which he claims was not previously disclosed–of a police officer who interviewed the victims. This document states that the victims told the officer that Petitioner "received a telephone call over his cellular telephone number

----

S. Ct. 2878 (2011) (new evidence is evidence not available at time of trial, except in situations where that evidence was not discovered due to the ineffective assistance of trial counsel). The Second Circuit has not yet addressed this issue, although I note that in Rivas, it cited with approval a 2004 decision in which Judge Kaplan agreed with the approach taken by Seventh and Ninth Circuits. 687 F.3d at 550 (citing Garcia v. Portuondo, 334 F. Supp. 2d 446, 454 (S.D.N.Y. 2004)). In that case, Judge Kaplan held–before the Second Circuit decided Rivas–that a successful gateway claim of actual innocence could excuse an untimely filed *habeas* petition. He also specifically held that "new evidence" need not be "limited to that unavailable at trial, so long as it is evidence that the original fact finder did not then consider." Garcia, 334 F. Supp. 2d at 454; see id. at 454 n.51 (collecting and comparing cases). Rivas, however, did not address the "new evidence" aspect of the Garcia decision.

Respondent argues that Petitioner's actual innocence gateway claim must be denied because the evidence he relies upon is not "new," *i.e.*, it existed and was known to Petitioner at the time he pled guilty. (See Resp't's Suppl. Mem. of Law, at 5-10.) I do not reach that issue in light of my conclusion that Petitioner's evidence fails to satisfy Schlup's "compelling" prong.

[17] The records also show that his phone made outgoing calls at 8:43, 8:55, 9:02, 9:02, 9:03, and 10:07 a.m. They further show that Petitioner's phone either received or made "routed" calls at 8:27, 8:42, 8:42, 8:54, 8:55, and 8:59 a.m. Petitioner does not explain what a "routed" call is, does not include the entire 16 page document, and fails to authenticate the document in any way.

[during the assault].  The girls overheard Tuitt's side of the conversation.  They report that it appeared his boss was looking for him."  (Pet'r's Answer to Opp'n, at Ex. 2.)  Petitioner contends that this information, taken together, is "compelling" because it reveals that the children lied to the police–specifically, because the document shows that no phone call was received by Tuitt's phone between 7:30 and 8:27 a.m.  (See Pet'r's Mem. of Law, at 4-5.)

Petitioner further contends that the assault would have to have occurred some time prior to 7:56 a.m., which is the time documented on the hotel receipt as the family's "Depart[ure]" time.  (See Pet'r's Resp. to Opp'n ¶ 5 & Ex. 2.)  He provides an excerpt of a Command and Movement Log, which he contends establishes that he: (1) arrived at work at the Riverdale (Bronx) precinct at 6:30 a.m.; (2) was "en route" somewhere beginning at 7:20 a.m.; and (3) returned to the police station at 8:20 a.m.  (See id. ¶ 6 & Ex. 2.)  Petitioner further asserts that when he left the precinct at 7:20 a.m., he went to a nearby restaurant and, when he discovered it was closed, proceeded to the hotel.  He states that he arrived at the hotel at 7:56 a.m. when the family was in the process of checking out, and then returned to the precinct.  (See id. ¶ 6.)  Petitioner contends that the Command and Movement Log is compelling evidence of his actual innocence because it shows that he did not have enough time to drive from Riverdale, to the restaurant, and then to the Yonkers hotel in time to have committed the assaults prior to the "Departure" time of 7:56 a.m.  He also asserts that the drive from the hotel to the precinct is 25 minutes and, accordingly, argues that the documents establish his actual innocence because they show that he did not have enough time to have committed the assaults after the family checked out at 7:56 a.m. and return to the precinct by 8:20 a.m.  (See id.)  Finally, Petitioner contends that the phone records reveal that certain 9:00 a.m. calls were directed off of a "679" cell tower.  He asserts this tower is located in the Bronx.  This information, he contends, shows that he was

not in the area of the hotel at the time of the assault.  (See id. & Ex. 2.)

Assuming, *arguendo*, that the documents accurately reflect what Petitioner claims they do, Petitioner fails to establish that they are "compelling enough to satisfy the Schlup standard." Rivas, 687 F.3d at 545.  First, the affidavit, phone records, and Command and Movement Log establish, at most, a credibility issue with respect to the victims.  Yet even if it is true that, contrary to the victims' statements to police, Petitioner did not receive a cell phone call during the time that the assaults occurred,[18] such credibility evidence "does not compellingly point to [Petitioner]'s innocence" to the extent that Schlup requires.  Id. at 546.  Absent some other "evidence, [which,] taken together, [would] raise[ ] doubts about [his] guilt," these documents do not suggest that Petitioner is actually innocent of the crimes.  Id.

Second, even if the hotel receipt accurately reflects the time that the victims' mother/guardian paid the hotel bill, this document does not establish when the room was vacated.  The police report indicates that the victims' mother/guardian told police that Petitioner arrived at the hotel around 7:30 a.m. while she was outside smoking a cigarette.  A hotel desk clerk corroborated this and told police that she saw Petitioner enter the hotel while the mother was outside.  (See Resp't's Suppl. Mem. of Law, at Ex. A.)  Accordingly, two eyewitnesses saw Petitioner arrive and enter the hotel around 7:30 a.m.  Petitioner had ample time and opportunity to commit the assaults in the hotel room at this time.  Moreover, Petitioner's self-serving and uncorroborated claim that,  after he left the Riverdale precinct at 7:20 a.m., he went to a restaurant and then spent 25 minutes driving (the short distance) to the hotel, is not credible or

---

[18] I note that the police report reflects that the hotel desk clerk told police that she had called the family's hotel room phone to remind them of the check-out time, and that a male voice answered the phone.  (See Resp't's Suppl. Mem. of Law, at Ex. A.)

compelling, nor is it new.

Finally, even if it is true that a 9:02 a.m. call bounced off of a Bronx cell tower, and that Petitioner did return to the Riverdale precinct at 8:20 a.m., this evidence does not make it any less likely that Petitioner was in the nearby Yonkers hotel earlier that morning.

### ii.    <u>Medical Records</u>

Petitioner contends medical examination reports of one of the victims, dated February 9, 2005, constitutes compelling, credible evidence that establishes his actual innocence in two ways.  (<u>See</u> Pet'r's Answer to Opp'n, at Ex. 4.)  First, Petitioner maintains that because the "records reveal that there were no signs of any sexual contact, intercourse, cuts, scrapes, abrasions and that the hymen was intact," there is no proof that this victim ever had intercourse, much less was raped.  (Pet'r's Mem. of Law, at 6.)  Petitioner also maintains that "during the medical examination a Rape Kit had to have been taken" because the medical providers "tested" certain fluids.  (<u>Id.</u>)  Petitioner contends that a Rape Kit would have collected DNA, which would exonerate him.  (<u>See id.</u>)

First, Petitioner's argument concerning the "missing" Rape Kit – and the DNA evidence he thinks it would contain – amounts to speculation, which is insufficient to support a gateway claim of actual innocence.  <u>See, e.g.</u>, <u>Maisonet v. Conway</u>, No. 04 Civ. 2860(CPS), 2007 WL 2027323, at *5 (E.D.N.Y. July 10, 2007) (quotation omitted) ("[w]here no new evidence has been provided in support of petitioner's assertions they therefore remain nothing more than naked speculation, and are insufficient for a finding of a fundamental miscarriage of justice").  Second, even assuming *arguendo* that a Rape Kit exists, that the Kit shows that Petitioner's DNA was not recovered from the victim, and that this evidence was improperly withheld from him, such evidence would not amount to "compelling" evidence of actual innocence.  It is well-

established that "'[s]upporting medical evidence is not required for a rape conviction.'" <u>Jackson</u>

<u>v. Conway</u>, 765 F. Supp. 2d 192, 286 (W.D.N.Y. 2011) (quoting <u>Moreno v. Kelly</u>, No. 95 Civ.

1546(JGK), 1997 WL 109526, at *4 (S.D.N.Y. Mar. 11, 1997)).  Any records or tests that

indicate that Petitioner's DNA was not recovered from this victim and/or that do not reveal signs

of physical trauma, simply do not prove that Petitioner did not rape or sexually assault the

victim.  <u>See id.</u> at 286-87 (collecting cases).

Petitioner further maintains that medical records reveal that at least one of the victims has

a mental disability which he asserts deprives her of the "[ ]ability to make decisions[ and] the

[ ]ability to perceive things."  (Pet'r's Mem. of Law, at 6; <u>see also</u> <u>id.</u> at 7-8; Pet'r's 2d Suppl., at

4-5.)  I disagree.  A review of the records that Petitioner provides does not corroborate his

contention.[19]  I find nothing in the documents to indicate that this victim is mentally disabled,

much less any medical conclusion or diagnosis that the victim lacks the ability to make decisions

or to perceive reality.  Even if they did, this would not amount to a showing that Petitioner is

innocent.  Accordingly, the medical documents Petitioner provides do not establish a compelling

claim of actual innocence.

### iii.    <u>Audio Tape</u>

---

[19] Petitioner specifically states:

The medical doctor made a notation that alleged victim "TG" has a history of
seizures and Hydrocepalus.  This means that she has a mental disability.
Hydrocepalus, known as water on the brain is not a common norm.  The alleged
victim was born with it and it has affected her mental development and causes her
to have seizures, the inability to make decisions, the inability to perceive things and
she is in need of special services.  Alleged victim "TG" story of being sexually
assaulted needed to be verified as there was any lack of coorborating [*sic*] evidence
to support her claims.

(Pet'r's Mem. of Law, at 6.)

24

Petitioner has submitted excerpts of an undated transcript from a "[c]ontrolled call" between Petitioner and the mother/guardian of the victims. (Pet'r's Answer to Opp'n, at 7; see id. at Ex. 5; see also Pet'r's 2d Supplemental, at Ex. 11.) During this call, one of the victims spoke to Petitioner. Petitioner contends, *inter alia*, that this conversation establishes his actual innocence because the victim did not describe the incident at the hotel and because she stated that Petitioner has a birthmark on his penis. Petitioner maintains that he has no such birthmark and that this transcript is evidence that the victim lied. (See Pet'r's Answer to Opp'n, at 7-9; see also Pet'r's Mem. of Law, at 9, 12.) I disagree. Even if the Court were to accept at face value Petitioner's self-serving statement that he has no birthmark, that would not exclude the possibility that Petitioner had some type of skin discoloration, wound, skin condition, or other marking at the time of the crimes. At most, this evidence could raise an issue as to one victim's credibility. However, as discussed above, such credibility evidence is insufficiently compelling to support a claim of actual innocence. See Rivas, 687 F.3d at 546.

### iv.   Conclusion as to Actual Innocence Gateway

Even when all of the "new" evidence presented by Petitioner is considered as a whole, along with other relevant information in the record (and without regard to the admissibility of the evidence), Petitioner fails to demonstrate that it is more likely than not that any reasonable juror would have reasonable doubt about his guilt. Although the "procedural actual innocence gateway exception applies even when a petitioner's conviction is, as here, the result of a guilty plea," Stern v. United States, No. 09 Civ. 6044(PAC)(FM), 2013 WL 71773, at *9 n.17 (S.D.N.Y. Jan. 4, 2013) (Report & Recommendation), adopted by 2013 WL 989382 (S.D.N.Y. Mar. 14, 2013); see Bousley v. United States, 523 U.S. 614, 623-24 (1998), "[t]he Second Circuit has held that a habeas court can consider a guilty plea in the context of making an actual

innocence determination," Bower v. Walsh, 703 F. Supp. 2d 204, 227-28 (E.D.N.Y. 2010)
(citing Doe, 391 F.3d at 168-69 and Rosario v. United States, 164 F.3d 729, 734 (2d Cir. 1998)).
This Court's confidence in the outcome of the proceeding is not shaken by any of the evidence
identified by Petitioner.  First, Petitioner pleaded guilty and allocuted to sexual assaults on the
three victims.  Second, the victims, the hotel clerk, and the mother/guardian each gave
statements to police which establish Petitioner's presence in the hotel and which demonstrate
that Petitioner had the time and the opportunity to commit the attacks.  Third, the new evidence
identified by Petitioner simply does not establish that he was not at the hotel or that the victims'
statements are false.  See, e.g., Desrosiers v. Phillips, No. 05 Civ. 2941(CBA)(JMA), 2006 WL
2092481, at *8 (E.D.N.Y. July 27, 2006) (Report & Recommendation) ("Moreover, petitioner
entered a plea of guilty under oath, giving a factual allocution satisfying each element of the
charge.  Thus petitioner cannot satisfy the standard of actual innocence.  In light of his guilty
plea, petitioner is hard-pressed to show that it is more likely than not that no reasonable juror
would have convicted him."); see also, e.g., Patel v. D. Martuscello, No. 10 Civ. 4804(CBA),
2011 WL 703943, at *5 (E.D.N.Y. Feb. 16, 2011) (where petitioner "pled guilty to possessing a
sexual performance by a child in violation of N.Y. Penal Law § 263.16," but where victim later
stated in letters that her father "never sexually abused her" and "only took pictures" of her,
petitioner did not make "a credible claim of actual innocence"); Ranta v. Bennett, No. 97 Civ.
2169(ERK)(JMA), 2000 WL 1100082, at *36 (E.D.N.Y. May 23, 2000) (actual innocence not
shown from new affidavit from victim stating that no rape occurred, where petitioner had
previously stated that it had and had pled guilty to the crime).

      Because Petitioner cannot establish actual innocence, I recommend that the untimeliness
of his petition not be excused pursuant to the miscarriage of justice gateway recognized in Rivas.

Accordingly, I respectfully recommend that the Court **DISMISS** the petition as time-barred.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above, I conclude–and respectfully recommend that Your Honor should conclude–that the petition should be **DISMISSED AS TIME-BARRED**.  Further, because reasonable jurists would not find it debatable that Petitioner has failed to demonstrate by a substantial showing that he was denied a constitutional right, I recommend that no certificate of appealability be issued.  <u>See</u> 28 U.S.C. § 2253(c); <u>Slack v. McDaniel</u>, 529 U.S. 473, 483-84 (2000).


Dated:  August 2, 2013
      White Plains, New York

                                     Respectfully Submitted,

                                     Paul E. Davison
                                     United States Magistrate Judge

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days, plus an additional three (3) days, or a total of seventeen (17) days, from service of this Report and Recommendation to serve and file written objections. <u>See also</u> Fed. R. Civ. P. 6(a), (b), (d).  Such objections, if any, along with any responses to the objections, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of the Honorable Cathy Seibel, at the Honorable Charles L. Brieant, Jr. Federal Building and United States Courthouse, 300 Quarropas Street, White Plains, New York 10601 and to the chambers of the undersigned at the same address.

27

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Seibel.

A copy of the foregoing Report and Recommendation has been mailed to:

Brian Tuitt, *pro se*
06-A-1963
Mid State Correctional Facility
P.O. Box 2500
Marcy, New York 13403

28